## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DANIEL C. FLINT,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

Case No. 22-13112
Hon. Gershwin A. Drain
Mag. Judge Anthony P. Patti

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

### I.    INTRODUCTION

This action is brought pursuant to the Federal Tort Claims Act ("FTCA") and alleges wrongful acts of Transportation Security Administration ("TSA") and Federal Bureau of Investigation ("FBI") employees while acting in the course and scope of their employment with Defendant.  The instant Motion is Defendant's request that this Court dismiss the action in its entirety pursuant to FRCP 12(b)(1) and/or 12(b)(6).

Specifically, Defendant contends: (1) Plaintiff's claims related to his incarceration are precluded by *Heck v. Humphrey, infra*; (2) Plaintiff's claims related to his incarceration are time-barred under 28 U.S. Code § 2401(b); (3) Plaintiff's claims related to his disbarment are not yet ripe pursuant to 28 U.S.C. § 2675(a); and (4) Plaintiff has failed to plead a cognizable claim for damages.

1

As discussed in detail below, however: (1) Plaintiff's claims related to his disbarment do not fall under the purview of *Heck v. Humphrey, infra*; (2) Plaintiff's claims related to his disbarment are timely; (3) those claims are also ripe, given the June 23, 2022 denial of Plaintiff's claim presented on Standard Form 95 on December 16, 2021; and (4) federal law acknowledges a claim for presenting false evidence under the FTCA.

## II.    BACKGROUND

On July 25, 2017, Plaintiff was travelling through Chicago Midway Airport on behalf of the International Human Rights Commission ("IHRC") as a diplomatic courier, transporting a diplomatic pouch.  (ECF No. 1, PageID.3).  Upon arriving at the security station, Plaintiff identified himself as a diplomatic courier, provided his courier letter and identification card, and informed TSA that he was carrying a diplomatic pouch on the IHRC's behalf that could not be screened.  (*Id.*).

Despite TSA permitting Plaintiff to pass through security without the pouch being screened, Plaintiff was arrested upon his arrival at Las Angeles International Airport.  (*Id.*)  Plaintiff was charged, prosecuted, and convicted of violation of 49 U.S.C. § 46314, entering aircraft or airport area in violation of security requirements, and incarcerated for approximately one year.  (ECF No. 1, PageID.4).

Prior to these events, Plaintiff was a licensed attorney in Michigan and North Carolina.  In September 2021, the North Carolina bar conducted an investigation in

2

which FBI Agent Rebecca Marriott testified falsely under oath, and ultimately disbarred Plaintiff.  (ECF No. 1, PageID.5).  Subsequently, Plaintiff was disbarred in Michigan when the State Bar adopted the same false factual findings as testified to by the FBI in the State Bar of North Carolina investigation.  (*Id.*).

### III.   LEGAL STANDARD

#### A. FRCP 12(b)(1) – Lack of Subject Matter Jurisdiction

"A Rule 12(b)(1) motion contains two separate challenges. The first concerns the complaint. The complaint must allege facts sufficient to indicate the presence of subject matter jurisdiction. If it does not, the complaint should be amended, or the case dismissed." *Wright v. U.S.*, 82 F.3d 419 (6th Cir. 1996).  "A Rule 12(b)(1) motion is also a challenge to the factual existence of subject matter jurisdiction. Regardless of what the complaint says, the court has no subject matter jurisdiction if the factual predicates of subject matter jurisdiction do not exist." *Id.*

"When a Rule 12(b)(1) motion attacks the factual basis for jurisdiction…the district court has broad discretion over what evidence to consider and may look outside the pleadings to determine whether subject-matter jurisdiction exists." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, at 647 (6th Cir. 2015).

#### B. FRCP 12(b)(6) – Failure to State a Claim

"Dismissal under Rule 12(b)(6) is appropriate only if there is no set of facts in the pleadings that would allow the plaintiff to recover." *Reed v. Family Life Ins.*

*Co.*, 86 F.3d 1156 (6th Cir. 1996). "The complaint must be construed in the light most favorable to plaintiff, and its well-pleaded facts must be accepted as true." *Morgan v. Church's Fried Chicken*, 829 F.2d 10 (6th Cir. 1987).

## IV. LAW AND ARGUMENT

### A. Plaintiff concedes that any claims related to his prosecution and incarceration are precluded by *Heck v. Humphrey* at this time, but other claims have been stated and Plaintiff is pursuing relief as it pertains to his conviction.

While Plaintiff's Standard Form 95 claims and his Complaint detail wrongful acts causing his arrest (i.e. TSA's negligent or intentionally wrongful conduct in permitting Plaintiff to bypass screening of the diplomatic pouch) and during his prosecution (e.g. perjury and evidence tampering), both of which independently led to his improper incarceration, those are not the only claims at issue in this litigation.

Specifically, Plaintiff noted on his Standard Form 95, "FBI's actions resulted in the loss of my license to practice law in the states of Michigan and North Carolina." (ECF No. 6-2, PageID.44). This is reiterated in his Complaint, which explains that the FBI's negligent and/or fraudulent acts in August 2021 during the North Carolina bar proceedings constitutes a distinct claim for damages. (ECF No. 1, PageID.5).

To be clear, Plaintiff's disbarment did not result from his criminal conviction, but rather was due to erroneous factual conclusions that Plaintiff lied to the FBI. (Ex. 1, page 4). Those factual conclusions were precipitated by FBI Agent Rebecca

Marriott's false testimony during bar proceedings separately from Plaintiff's prosecution.

*Heck v. Humphrey*, 512 U.S. 477 (1994) is inapplicable to claims arising out of the FBI's wrongful conduct in August 2021, as those claims relate exclusively to his disbarment and do not inherently or otherwise challenge Plaintiff's conviction. At this time, Plaintiff acknowledges that he cannot pursue claims for wrongful conviction or incarceration, but intends to pursue those claims once his conviction is set aside.

### B. Plaintiff is not currently pursuing claims arising out of his prosecution and incarceration, mooting the FTCA's statute of limitations for such claims.

While Plaintiff has stated facts related to his prosecution and incarceration, he is not pursuing claims related to those events at this time.  Instead, Plaintiff claims that FBI Agent Rebecca Marriott testified falsely during his North Carolina bar investigation, leading to his disbarment in September 2021.  (ECF No. 1, PageID.5). Plaintiff was later disbarred in Michigan after that bar accepted the factual findings from the North Carolina investigation.  (*Id.*).

"A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to

which it was presented."  28 U.S. Code § 2401(b).

"A claim accrues within the meaning of § 2401(b) when the plaintiff knows both the existence and the cause of his injury…"  *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352 (1979).  Plaintiff's claims related to his disbarments indisputably accrued no earlier than September 2021 when the injury occurred, and are therefore timely under the FTCA.

### C. Plaintiff has properly exhausted the requisite administrative remedy.

As Defendant correctly notes, a claim under the FTCA must first be presented to the appropriate agency and either denied or not disposed within six months before legal action can be commenced.  See 28 U.S.C. § 2675(a).  The administrative remedy requirements are met, permitting litigation, "'if the claimant (1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim."  *Douglas v. U.S.*, 658 F.2d 445, at 447 (6th Cir. 1981) (internal quotation omitted).

Plaintiff submitted a Standard Form 95 dated December 16, 2021 that apparently went to the Department of Justice, but was forwarded to the FBI ("First Claim").  (ECF No. 6-2, PageID.43-47).  The claim states, "FBI's actions resulted in the loss of my license to practice law in the states of Michigan and North Carolina."  (*Id*.)  That claim was denied June 23, 2022 (ECF No. 6-2, PageID.49).  Plaintiff commenced this action December 22, 2022, within six months of the denial.

(ECF No. 1).

The First Claim was accompanied by a document explaining the claims related to Plaintiff's arrest, prosecution, and conviction, but did not go into detail regarding his disbarment. (See ECF No. 6-2, PageID.46-47). The First Claim listed the date and day of "accident" as "Approx 7/25/2017." (ECF No. 6-2, PageID.44).

Plaintiff submitted a second Standard Form 95 to the FBI (again through the Department of Justice) on or about October 31, 2022 ("Second Claim"). (ECF No. 6-2, PageID.50-54). The damage explanation on the Standard Form 95 regarding the Second Claim repeated the statement from the First Claim verbatim. (ECF No. 6-2, PageID.51).

The Second Claim stated the date and day of "accident" as "Approx September 2021." The Second Claim was accompanied by a document identical to the First Claim, except for the addition of a final paragraph expounding on the disbarment claims. (ECF No. 6-2, PageID 54).

Defendant seems to argue that the First Claim is time-barred because it states an "accident" date from July 2017, but has proffered no authority for the indispensable premise of such an argument that the date on the form necessarily constitutes the accrual date of the claim. Plaintiff submits that the July 2017 date on the First Claim is extraneous information and cannot be imputed to Plaintiff as a legal conclusion of the accrual date.

Indeed, the only elements necessary to satisfy the administrative remedy requirement are sufficient written notice to permit investigation of the claim, and a value of the claim.  See *Douglas, supra*.  Because the First Claim expressly noted the disbarments and stated a claim value, and because the First Claim was denied prior to commencement of this action, Plaintiff's claims are not barred.

Plaintiff submitted the Second Claim only as a "belt and suspenders" approach, fearing that the statement of date of "accident" and the failure to expound on the disbarment claims could be argued the very way Defendant argues in this Motion.  However, under controlling law, those arguments are unpersuasive. Specifically, the date of "accident" in the First Claim is not even an element of the requisite information and does not somehow operate to preclude a second claim accrual date contained within the form.  Moreover, even without specific detail as to the disbarment claims, the First Claim did provide sufficient information to enable investigation of the claim.

Because the First Claim satisfies 28 U.S.C. § 2675(a) and has been denied, this action is proper.  The Second Claim is extraneous and moot to the analysis.

**D. Plaintiff has stated cognizable claims for intentional infliction of emotional distress and negligence arising out of the FBI's wrongful acts related to his disbarment claims.**

Defendant correctly notes that the FTCA's general waiver of sovereign immunity has a claw-back for certain intentional torts, including misrepresentation.

See 28 U.S.C. § 2680(h).  However, the "intentional tort exception" colloquial description of this provision has been noted by the Supreme Court to be "not entirely accurate."  *Levin v. United States*, 133 S.Ct. 1224, 568 U.S. 503, fn. 1 (2013). Specifically, "This shorthand description is not entirely accurate. Section 2680(h) does not remove from the FTCA's waiver all intentional torts..." *Id.*  Intentional infliction of emotional distress is not part of the intentional tort claw-back of Defendant's sovereign immunity waiver.  See 28 U.S.C. § 2680(h).

"To establish [a claim for intentional infliction of emotional distress], plaintiff must have shown that defendants engaged in extreme and outrageous conduct that was intended to cause severe emotional distress, or were recklessly indifferent to the likelihood that such distress would result, and that severe distress did result from defendants' conduct." *Groves v. Travelers Ins. Co.*, 139 N.C.App. 795, 535 S.E.2d 105, at 107 (N.C. App. 2000), citing *Dickens v. Puryear*, 302 N.C. 437, 452; 276 S.E.2d 325, 335 (1981).

In his Complaint, Plaintiff alleges that FBI Agent Rebecca Marriott committed perjury when testifying at his North Carolina bar hearing and that her testimony led to his disbarment in North Carolina and Michigan.  (ECF No.1, PageID.5).  This conduct is surely extreme and outrageous, and either intended to cause Plaintiff severe emotional distress or with reckless disregard for the likelihood of that distress.

Concurrently with the filing of this Response, Plaintiff is filing his First Amended Complaint as of right pursuant to FRCP 15(a)(1)(B). The First Amended Complaint provides more specific averments in paragraphs 32 and 33 detailing the claim for intentional infliction of emotional distress. (Ex. 2, page 7).

Moreover, Plaintiff has stated a viable claim for negligence related to his disbarment claims. "The elements of negligence are: 1) legal duty; 2) breach of that duty; 3) actual and proximate causation; and 4) injury." *Mabrey v. Smith*, 144 N.C. App. 119, 548 S.E.2d 183, 186 (N.C. App. 2001), citing *Tise v. Yates Constitution. Co., Inc.*, 345 N.C. 456, 480 S.E.2d 677 (1997).

Rebecca Marriott had a duty to testify truthfully and accurately during Plaintiff's North Carolina bar investigation. That duty was breached when she provided false testimonial evidence. The breach was the actual and proximate cause of Plaintiff's disbarment in North Carolina and Michigan, causing him severe economic injury in the form of lost business opportunities and income. Again, Plaintiff's concurrently filed First Amended Complaint provides additional detail of the negligence claim at paragraphs 34-36. (Ex. 2, pages 7-8).

Defendant's argument on this subject constitutes a quintessential red herring, as it focuses on facts and circumstances unrelated to Plaintiff's disbarment claims. It is also important to note that Defendant has not challenged the substantive, factual basis of Plaintiff's claims for intentional infliction of emotional distress or

negligence, but instead argues only that Plaintiff has failed to state a claim on which relief can be granted.  Even if the initial Complaint did not properly plead these claims (though Plaintiff asserts that it did), the First Amended Complaint surely meets the pleading requirements, making dismissal inappropriate.

Finally, Plaintiff's First Amended Complaint additionally states a claim for civil conspiracy.  "To create civil liability for conspiracy there must have been a wrongful act resulting in injury to another committed by one or more of the conspirators pursuant to the common scheme and in furtherance of the objective." *Henry v. Deen*, 310 N.C. 75, 310 S.E.2d 326, 334 (N.C. 1984), citing *Muse v. Morrison*, 234 N.C. 195, 66 S.E.2d 783 (1951).

Paragraphs 37-40 detail a concerted effort between the TSA and the FBI in connection with Plaintiff's North Carolina disbarment proceedings.  Specifically, Rebecca Marriott acted to further that conspiracy by providing false evidence during those proceedings, causing Plaintiff severe injury, including the loss of both his North Carolina and Michigan law licenses.  (Ex. 2, page 8).

## V.    CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court DENY Defendant's Motion in its entirety.

Respectfully Submitted,
Sigal Law Firm, PLLC

*/s/ Vadim Sigal*

_____
Vadim Sigal (P74067)
vsigal@sigallaw.com
David Adgate
dadgate@sigallaw.com
Attorneys for Plaintiff
27041 Southfield Road, Suite 100
Southfield, MI 48076

Date:  December 22, 2022

# EXHIBIT 1



STATE OF NORTH CAROLINA

WAKE COUNTY

BEFORE THE
DISCIPLINARY HEARING COMMISSION
OF THE
NORTH CAROLINA STATE BAR
19 DHC 4

| | |
|---|---|
| THE NORTH CAROLINA STATE BAR,<br>            Plaintiff<br><br>v.<br><br>DANIEL C. FLINT, Attorney,<br>            Defendant | ORDER OF DISCIPLINE |

This matter came on for hearing on August 3 – 4, 2021, by a Hearing Panel of the Disciplinary Hearing Commission composed of Stephanie N. Davis, Chair, and members Margaret M. Hunt and Jane B. Weathers. Plaintiff, the North Carolina State Bar, was represented by Savannah B. Perry and Margaret T. Cloutier. Defendant, Daniel C. Flint, appeared *pro se*.

Based upon the record proper and the testimony and exhibits admitted at the hearing, and upon making credibility determinations of the witnesses who testified at the hearing, the Hearing Panel finds by clear, cogent, and convincing evidence the following:

## FINDINGS OF FACT

1.    Plaintiff, the North Carolina State Bar ("State Bar"), is a body duly organized under the laws of North Carolina and is the proper party to bring this proceeding under the authority granted it in Chapter 84 of the General Statutes of North Carolina, and the Rules and Regulations of the North Carolina State Bar (Chapter 1 of Title 27 of the North Carolina Administrative Code).

2.    Defendant, Daniel C. Flint, was admitted to the North Carolina State Bar on February 26, 2016, and is, and was at all times referred to herein, an attorney at law licensed to practice in North Carolina, subject to the laws of the State of North Carolina, the Rules and Regulations of the North Carolina State Bar, and the Rules of Professional Conduct.

3.    During all or part of the relevant periods referred to herein, Flint was engaged in the practice of law in Charlotte, Mecklenburg County, North Carolina.

4.    Flint was properly served with process, a hearing in this matter was set, and the matter came before the hearing panel with due notice to all parties.

5.    On July 20, 2017, Flint arrived at a Transportation Security Administration (TSA) checkpoint at O'Hare International Airport (O'Hare) carrying a bag.

6.     Flint informed the TSA agents he was a diplomatic courier for the International Human Rights Commission (IHRC) and stated that the bag was a diplomatic pouch carried on behalf of the IHRC.

7.     Flint presented to the TSA agents purported diplomatic credentials and requested that the bag be exempted from TSA screening.

8.     Flint's purported diplomatic credentials included a fraudulent diplomatic identification card that purported to have been issued by the IHRC.

9.     The TSA agents informed Flint that a valid diplomatic passport must be presented to allow a diplomatic pouch to bypass security and that Flint's purported diplomatic credentials did not satisfy that requirement.

10.    The TSA agents refused to allow the bag to bypass security and Flint left the airport.

11.    That same day, Flint arrived at a TSA checkpoint at Chicago Midway International Airport (Midway) carrying a bag.

12.    Flint informed the TSA agents he was a diplomatic courier for the IHRC and stated that the bag was a diplomatic pouch carried on behalf of the IHRC.

13.    Flint presented to the TSA agents the same purported diplomatic credentials as presented at O'Hare and requested that the bag be exempted from TSA screening.

14.    The TSA agents reviewed Flint's purported diplomatic credentials and allowed Flint to proceed through the checkpoint without screening the bag.

15.    Flint boarded a flight to Minneapolis-St. Paul International Airport, with a later connecting flight to Los Angeles International Airport (LAX).

16.    On July 25, 2017, Flint arrived at a TSA checkpoint at Midway carrying a bag.

17.    Flint again informed the TSA agents he was a diplomatic courier for the IHRC and stated that the bag was a diplomatic pouch carried on behalf of the IHRC.

18.    Flint presented to the TSA agents the same purported diplomatic credentials as presented on July 20, 2017 and requested that the bag be exempted from TSA screening.

19.    The TSA agents reviewed Flint's purported diplomatic credentials and again allowed Flint to proceed through the checkpoint without screening the bag.

20.    Flint boarded a flight to Minneapolis-St. Paul International Airport, with a later connecting flight to LAX.

*N.C. State Bar v. Daniel C. Flint*, 19DHC4
Order of Discipline

21.     While Flint was en route to LAX, The Federal Bureau of Investigation (FBI) was notified that Flint was flying into LAX with a bag that had not been screened.

22.     When the plane arrived at LAX, federal agents and other law enforcement officers approached Flint and interviewed him at the airport.

23.     During the interview, Flint continued to maintain that he was a diplomatic courier for the IHRC.

24.     The IHRC is not and has never been a registered international organization with the U.S. Department of State Office of Foreign Missions.

25.     Flint is not and has never been registered as having diplomatic status with the U.S. Department of State Office of Foreign Missions.

26.     Flint's statements to TSA agents and the FBI that he was a diplomatic courier for the IHRC were false.

27.     Flint knew that his statements to TSA agents and the FBI that he was a diplomatic courier for IHRC were false.

28.     During the interview, Flint told Special Agent R. Marriot of the FBI that he had not been turned away from an airport security checkpoint before when presenting his purported diplomatic credentials.

29.     Flint's statement to Special Agent R. Marriot was false.

30.     Flint knew at the time he made the statement to Special Agent R. Marriot that it was false.

31.     Pursuant to 18 U.S.C. § 1001, it is a felony to knowingly and willfully make a materially false statement to the FBI.

32.     Pursuant to 49 U.S.C. §§ 46314(a) and (b)(2), it is a felony for an individual to knowingly and willfully enter an airport area that serves an air carrier in violation of security requirements and regulations prescribed under sections 44901 and 44903(c) of Title 49 of the United States Code and to act with the intent to evade the security regulation.

33.     Flint was criminally charged in the U.S. District Court for the Central District of California with intentionally evading airport security requirements in violation of 49 U.S.C. §§ 46314(a) and (b)(2), a felony.

34.     On October 19, 2018, a jury found Flint guilty of intentionally evading airport security requirements in violation of 49 U.S.C. §§ 46314(a) and (b)(2), a felony.

35.   Flint was subsequently sentenced to fourteen months incarceration in the U.S. Bureau of Prisons.

Based upon the foregoing Findings of Fact, the Disciplinary Hearing Panel makes the following:

CONCLUSIONS OF LAW

1.   All parties are properly before the Hearing Panel and the Hearing Panel has jurisdiction over Defendant, Daniel C. Flint, and over the subject matter of this proceeding.

2.   Flint's conduct, as set out in the Findings of Fact above, constitutes grounds for discipline pursuant to N.C. Gen. Stat. § 84-28(b)(2) in that Flint violated the Rules of Professional Conduct in effect at the time of his conduct as follows:

    (a) By knowingly and willfully misrepresenting himself as a diplomatic courier for the IHRC to TSA agents on July 20 and July 25, 2017 with the intent to bypass screening of his bag, Flint committed criminal acts that reflect adversely on his honesty, trustworthiness or fitness as a lawyer in violation of Rule 8.4(b) and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

    (b) By knowingly and willfully presenting a fraudulent diplomatic identification card to TSA agents on July 20 and July 25, 2017 with the intent to bypass screening of his bag, Flint committed criminal acts that reflect adversely on his honesty, trustworthiness or fitness as a lawyer in violation of Rule 8.4(b) and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

    (c) By knowingly making false statements to the FBI that he was a diplomatic courier, Flint committed criminal acts that reflect adversely on his honesty, trustworthiness or fitness as a lawyer in violation of Rule 8.4(b) and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c); and

    (d) By knowingly making a false statement to the FBI that he had not previously been turned away from an airport security checkpoint when presenting his purported diplomatic credentials, Flint committed criminal acts that reflect adversely on his honesty, trustworthiness or fitness as a lawyer in violation of Rule 8.4(b) and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c).

3.   Flint's conduct also constitutes grounds for discipline pursuant to N.C. Gen. Stat. § 84-28(b)(1) in that Flint was convicted of a felony showing professional unfitness.

Based upon the foregoing Findings of Fact and Conclusions of Law, and the testimony and exhibits presented by the parties at the hearing, the Hearing Panel finds by clear, cogent, and convincing evidence the following:

## FINDINGS OF FACT REGARDING DISCIPLINE

1.     The findings of fact in paragraphs 1 through 35 above are incorporated as if set forth herein.

2.     Flint was licensed to practice law in Michigan around 2010 and in North Carolina in 2016. Thus, at the time his misconduct occurred, Flint had experience in the practice of law.

3.     Flint admitted that he had previously presented himself as a diplomatic courier and presented purported diplomatic credentials to TSA agents numerous times before. This shows a pattern of engaging in the same misconduct involving deception and misrepresentations to the TSA.

4.     Flint did not acknowledge the wrongfulness of his conduct, nor did he show any remorse for his actions.

5.     Flint's assertions that he believed in good faith he was a diplomatic courier for an alleged international organization not recognized by the U.S. Department of State Office of Foreign Missions were not credible and were not consistent with the evidence received at the hearing in this matter.

6.     Flint knew at the time he presented his purported diplomatic credentials to the TSA that they were fraudulent. The "identification card" Flint carried and presented to TSA and the FBI had no security features and had obvious grammatical errors. Flint laminated the card himself. His "diplomatic courier direction letter," which he relied upon in his interactions with the TSA, the FBI, and other federal agencies, were sent to him in a Word template. The credentials Flint possessed and used had errors and contradictions that would have alerted any reasonable person that they were fraudulent.

7.     Flint's commission of felonious criminal acts reflecting adversely on his honesty, trustworthiness or fitness as a lawyer caused significant harm to the legal profession, in that criminal conduct by attorneys tends to bring the legal profession into disrepute.

8.     Flint's dishonest conduct towards the TSA and the FBI caused significant harm to the public and the profession, in that it showed himself to be untrustworthy as a lawyer. Courts, other lawyers, and clients must be able to rely upon the trustworthiness of lawyers. Flint's actions deprive any ability of the courts, other lawyers, and potential clients to rely on his representations and advice.

9.     Flint's dishonest conduct, his misrepresentations to TSA and the FBI, and his attempts to evade security resulted in significant harm to the public and to the TSA, the FBI, and other responding agencies in that his misconduct required those agencies to divert time and

resources toward investigating Flint over other potential threats to the safety of the traveling public.

10.     Flint's misconduct resulted in other sanctions, in that a jury from the U.S. District Court for the Central District of California found Flint guilty of intentionally evading airport security requirements in violation of 49 U.S.C. §§ 46314(a) and (b)(2), for which Flint was subsequently sentenced to fourteen months incarceration in the U.S. Bureau of Prisons.

11.     The Hearing Panel finds by clear, cogent, and convincing evidence the facts contained in the conclusions it makes, set out below, of the applicable factors regarding discipline from those listed in 27 N.C. Admin. Code 1B.0116(f).

<u>CONCLUSIONS REGARDING DISCIPLINE</u>

1.     The Hearing Panel considered all of the factors enumerated in 27 N.C.A.C. 1B § .0116(f)(1) of the Rules and Regulations of the North Carolina State Bar and concludes that the following factors are applicable in this matter:

(a) Intent of Flint to commit acts where the harm or potential harm is foreseeable; and

(b) Acts of dishonesty, misrepresentation, deceit, or fabrication.

2.     The Hearing Panel considered all of the factors enumerated in 27 N.C.A.C. 1B § .0116(f)(2) of the Rules and Regulations of the North Carolina State Bar and concludes that the following factors are applicable in this matter:

(a) Acts of dishonesty, misrepresentation, deceit, or fabrication; and

(b) Commission of a felony.

3.     The Hearing Panel considered all of the factors enumerated in 27 N.C.A.C. 1B § .0116(f)(3) of the Rules and Regulations of the North Carolina State Bar and concludes that the following factors are applicable in this matter:

(a) Dishonest or selfish motive;

(b) Refusal to acknowledge wrongful nature of conduct;

(c) Degree of experience in the practice of law; and

(d) Imposition of other penalties or sanctions.

4.     The Hearing Panel carefully considered all of the different forms of discipline available to it.

5.     Flint has refused to acknowledge the wrongfulness of his conduct, and there is no evidence suggesting that he intends to do so in the future or otherwise modify his behavior. Accordingly, if Flint were permitted to continue practicing law, he would pose a significant and

*N.C. State Bar v. Daniel C. Flint*, 19DHC4
Order of Discipline

unacceptable risk of harm to the clients, the profession, the public, and the administration of justice.

6.     Disbarment is the only sanction that can adequately protect the public for the following reasons:

(a) An order of discipline less than disbarment would fail to acknowledge the seriousness of the offenses that Flint committed and would send the wrong message to attorneys and the public regarding the conduct expected of members of the Bar in North Carolina.

(b) The protection of the public requires that Flint not be permitted to resume the practice of law unless and until he demonstrates that he has reformed, that he understands his obligations to his clients, the public, the courts, and the legal profession, and that reinstatement would not injure the standing of the legal profession. Disbarred attorneys must show reformation, among other things, before they may resume the practice of law, whereas no such showing of reformation is required of attorneys whose licenses are suspended.

Based upon the foregoing Findings of Fact, Conclusions of Law, and the additional Findings of Fact and Conclusions of Law Regarding Discipline, the Hearing Panel hereby enters the following:

## ORDER OF DISCIPLINE

1.     Daniel C. Flint is hereby DISBARRED from the practice of law.

2.     Flint shall surrender his law license and membership card to the Secretary of the State Bar no later than 30 days from service of this order upon him.

3.     Flint shall pay the administrative fees and costs of this proceeding as assessed by the Secretary of the North Carolina State Bar no later than 90 days from service of this order upon Flint.

4.     Flint shall comply with all provisions of 27 N.C. Admin. Code 1B.0128 of the North Carolina State Bar Discipline & Disability Rules.

5.     Within 15 days of the effective date of this order, Flint shall provide the State Bar with an address and telephone number at which clients seeking information or return of files can communicate with Flint and obtain such files, and Flint shall promptly return all files to his clients upon request.

6.     Flint shall promptly return client files in his possession, custody, or control to clients upon request, within 5 days of receipt of such request. Flint will be deemed to have received any such request 3 days after the date such request is sent to Flint if the request is sent to the address Flint provided the State Bar pursuant to the preceding paragraph.

Signed by the Chair with the consent of the other Hearing Panel members, this the 7th day of September 2021.

_Stephanie N. Davis_
Stephanie N. Davis, Chair
Disciplinary Hearing Panel

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DANIEL C. FLINT,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

Case No. 22-13112
Hon. Gershwin A. Drain
Mag. Judge Anthony P. Patti

---

## FIRST AMENDED COMPLAINT

1.      Plaintiff, DANIEL C. FLINT, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 ("FTCA"), seeks compensatory and punitive damages arising from Defendant UNITED STATES OF AMERICA's ("USA") negligence and/or fraud in connection with Plaintiff's indictment, conviction, and incarceration after interaction with the Federal Bureau of Investigation ("FBI") and the Transportation Security Administration ("TSA") on July 25, 2017 on the charge of violating 49 U.S.C. § 46314 as well as subsequent negligence and/or fraud in connection with State Bar of North Carolina and State Bar of Michigan investigations resulting in Plaintiff's disbarment in both jurisdictions.

## Jurisdiction and Venue

2.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the action arises under the laws of the United States of America

1

and is premised on the acts and omissions of Defendants acting under color of federal law.  This Court further has subject matter jurisdiction pursuant to 28 USC § 1346(b), as the action involves a claim against Defendant UNITED STATES OF AMERICA ("USA") for money damages caused by the negligent and/or fraudulent acts and omissions of FBI and TSA employees while acting in the scope and course of their employment and where USA, if a private person, would be liable to Plaintiff.

3.      Jurisdiction founded upon federal law is proper, as this action is premised on federal causes of action under the FTCA, 28 U.S.C. § 2671, *et. seq.*

4.      On December 16, 2021, Plaintiff presented a claim for damages to the FBI related to the July 25, 2017 interactions resulting in his indictment, conviction, and imprisonment detailing the FBI's tortious conduct.  On June 23, 2022, the office of the General Counsel, on behalf of the U.S. Department of Justice, denied that claim.  This action was then timely filed.

5.      Also on December 16, 2021, Plaintiff presented a claim for damages to the TSA related to the July 25, 2017 interactions resulting in his indictment, conviction, and imprisonment detailing the TSA's tortious conduct.  On August 17, 2022, the office of the General Counsel, on behalf of the U.S. Department of Justice, denied that claim.  This action was then timely filed.

6.      On October 16, 2022, Plaintiff presented another claim for damages to the FBI outlining separate tortious conduct in September 2021 related to the State

2

Bar of North Carolina and the State Bar of Michigan investigations of Plaintiff, which ultimately resulted in his disbarment in both jurisdictions. Upon information and belief, this claim is still pending and has not been denied at this time.

7.     This action is timely pursuant to 28 U.S.C. § 2401(b), as the claims were presented to the appropriate federal agency within two years of accrual and this action was filed within six months of receipt of the claim denials.

8.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (c)(2), as Defendant resides in this district by virtue of maintaining the capacity to sue and be sued in its common name under applicable law and is subject to this Court's personal jurisdiction with respect to these claims under the FTCA.

## Parties

9.      Plaintiff is a natural person who currently resides in Macomb County, Michigan.

10.     Defendant is subject to claims for tortious actions caused by the negligent and/or intentional and wrongful acts and omissions by employees of the FBI and the TSA while acting within the course and scope of their office or employment, under the circumstances where Defendant, if a private person, would be liable to Plaintiff.

## Statement of Claim

11.   On July 25, 2017, Plaintiff was travelling through Chicago Midway

Airport on behalf of the International Human Rights Commission ("IHRC") as a diplomatic courier, transporting a diplomatic pouch.

12.    Upon arriving at the security station, Plaintiff identified himself as a diplomatic courier and informed TSA that he was carrying a diplomatic pouch on the IHRC's behalf.

13.    Plaintiff presented the TSA supervisor with his courier letter, diplomatic identification card, and diplomatic pouch.

14.    TSA reviewed the documents and the pouch and permitted Plaintiff to pass through security as normal, but without screening the diplomatic pouch.

15.    Upon information and belief, at some point shortly after Plaintiff's flight departed Chicago Midway Airport, TSA agents from that location contacted TSA and/or FBI agents at the destination, Las Angeles International Airport, and indicated that Plaintiff did not have the requisite credentials to be traveling as a diplomatic courier and to avoid screening of the diplomatic pouch.

16.    Immediately upon landing, Plaintiff was arrested and forcibly removed from the plane as well as his separated from his belongings.

17.    Subsequently, Plaintiff was charged with a felony on the premise that the credentials he had presented when proceeding through TSA, credentials which TSA verified were proper and appropriate, were, in fact, insufficient.  TSA either acted negligently or intentionally fraudulently by taking mutually exclusive

positions regarding Plaintiff's diplomatic status.

18.     Plaintiff was detained and questioned by the FBI.  That interview was recorded.  The recording was doctored and portions were removed by the FBI prior to admitting the recoding into evidence in Plaintiff's criminal trial.  The FBI agents who conducted the interview committed perjury during Plaintiff's criminal trial about what was said.  Specifically, the FBI agents testified that Plaintiff indicated that he had never been turned away by TSA in the past, and that was false.  Additionally, the FBI agents testified falsely that Plaintiff indicated he personally had diplomatic immunity, which was also false.

19.     The doctored evidence and false statements under oath were the cause of Plaintiff's conviction, according to the jury when polled after the verdict was entered.

20.     The FBI's recklessly made or intentionally false statements made during Plaintiff's criminal prosecution were the cause of Plaintiff's undue conviction and prison sentence.

21.     Plaintiff has been irreparably injured by Defendant through the negligent or intentionally tortious actions of the TSA.  Either the TSA acted negligently in permitting Plaintiff to proceed without screening of the diplomatic pouch, or it acted intentionally fraudulently when its agents testified that the documentation was insufficient.

22.     Plaintiff has been irreparably injured by Defendant through the negligent or intentionally tortious actions of the FBI.  The FBI agents' testimony regarding Plaintiff's statements was made either in reckless disregard for the truth, or knowing that portions of the audio recording had been removed intentionally to obtain a false conviction.

23.     All TSA and FBI agents at issue, whether during the events on July 25, 2017 or as witnesses for Defendant at trial, were operating in the scope and course of their employment by Defendant.

24.     As detailed above, there is no possible explanation for the events other than that the TSA and the FBI acted negligently or intentionally wrongfully in obtaining Plaintiff's conviction.

25.     Consequently, Defendant has been irreparably injured by the deprivation of his freedom due to Defendant's wrongful acts.

26.     The FBI perpetuated its wrongful conduct when Plaintiff was investigated by the State Bar of North Carolina after his release from prison.  In approximately September 2021, FBI agent Rebeca Marriott committed perjury when she falsely testified yet again in relation to that investigation.  Ultimately, Plaintiff was disbarred from legal practice in North Carolina.

27.     Subsequently, Plaintiff was disbarred in Michigan when the State Bar adopted the same false factual findings as testified to by the FBI in the State Bar of

North Carolina investigation.

28.    This is a separate act of negligence and/or intentional tortious conduct from the wrongful conduct that resulted in Plaintiff's improper incarceration.

29.    Plaintiff was injured by the FBI's conduct during his state bar investigations by virtue of being disbarred and deprived of the opportunity to practice law and generate income from that profession.

30.    The FBI, and specifically Rebeca Marriott, was acting in the course and scope of its duties to Defendant when participating in Plaintiff's state bar investigations.

31.    Either the FBI, through Rebecca Marriott,  testified recklessly, with disregard of the truth of affirmative, sworn testimony, or it operated intentionally fraudulently when repeating the false statements regarding Plaintiff's criminal proceeding, as detailed above.

**32.    The FBI's conduct (i.e. Rebecca Marriott's false testimony) was extreme and outrageous with either the intent to cause severe emotional distress to Plaintiff or with reckless disregard that such distress would result.**

**33.    Plaintiff did suffer severe emotional distress from the FBI's conduct for which he is entitled to compensatory and punitive damages.**

**34.    The FBI and Rebecca Marriott had a duty to testify truthfully and accurately during Plaintiff's North Carolina bar investigation.**

**35.    That duty was breached when Rebecca Marriott presented false testimonial evidence.**

**36.    The false evidence was the actual and proximate cause of Plaintiff being disbarred in North Carolina and Michigan, thereby causing him severe injury in the form of lost business opportunities and income.**

**37.    The TSA, FBI, and other government employees acted in concert to alter evidence and provide false testimony in Plaintiff's criminal trial.**

**38.    These acts were committed as part of the common scheme and in furtherance of the objective to injure Plaintiff by obtaining a wrongful conviction.**

**39.    Subsequently, Rebecca Marriot perpetuated the conspiracy when she again provided false evidence in connection with Plaintiff's North Carolina bar investigation.**

**40.    These wrongful acts resulted in significant injury to Plaintiff, including the loss of is North Carolina and Michigan bar licenses, thereby causing him severe injury in the form of lost business opportunities and income.**

41.    The harm to Plaintiff, separately from his incarceration, implicates compensatory damages due to his loss of income resulting from his disbarment.

### Relief Requested

WHEREFORE, Plaintiff, DANIEL C. FLINT, demands judgment against

Defendant, UNITED STATES OF AMERICA, as follows:

a. $10,000,000.00 as compensatory damages;

b. $100,000,000.00 as punitive damages;

c. costs of litigation;

d. post-judgment interest;

e. and any other relief as the Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

The Plaintiff hereby demands a trial by a jury on all claims.

Respectfully Submitted,

Sigal Law Firm, PLLC

*/s/ Vadim Sigal*

_____

Vadim Sigal (P74067)
vsigal@sigallaw.com
David Adgate
dadgate@sigallaw.com
27041 Southfield Road, Suite 100
Southfield, MI 48076

Date: December 22, 2022                    *Attorneys for Plaintiff*